*Parkway Neuroscience and Spine Institute, LLC v. Katz, Absoch, Windesheim, Gershman & Freedman, P.A.*, *et al.*, No. 658, September Term, 2021, Opinion by Adkins, J.

**EVIDENCE-EXPERT TESTIMONY:** The admissibility of expert testimony is largely within the discretion of the trial court. Such a ruling, however, may be reversed on appeal if it is founded upon an error of law. Judges making discretionary rulings must apply correct legal standards.

**EVIDENCE—*DAUBERT-ROCHKIND*:** A trial court, in its gatekeeper role under *Rochkind* and *Daubert*, acts improperly in excluding the testimony of a qualified certified public accountant testifying about lost profits of an LLC medical practice—on grounds that the expert's experience with such analysis, although extensive, had only included one medical practice. Any lack of specialized experience is ripe for cross-examination at trial.

**EVIDENCE—*DAUBERT-ROCHKIND*:** Trial court erred in holding expert testimony unreliable under the *Daubert-Rochkind* standard after accepting expert's methodology—the before-and-after method of calculating lost profits. Court's rationale was (1) using 2015 as the base year; (2) failing to consider changes in insurance reimbursement rates; (3) failing to articulate standards to define economic impact and treat member draws; (4) changing her calculations while the underlying facts remained the same; and (5) failing to offer calculations for profit loss based on variable jury determinations. None of these criticisms addressed methodology, and they were more appropriate for cross-examination and advocacy at trial.

**EVIDENCE—MARYLAND RULE 5-702:** Maryland Rule 5-702 requirement that there is "a sufficient factual basis" supporting the testimony does not justify a trial court's exclusion of such testimony based upon the correctness of the expert's conclusions. "[A]nalytical focus should be on principles and methodology. Trial courts may not reject expert testimony simply because they disagree with the conclusions reached by the witness." Jack B. Weinstein, Weinstein's Federal Evidence 702.05[2][a] (2d ed. 1997).

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0658

September Term, 2021

_____

PARKWAY NEUROSCIENCE AND SPINE
INSTITUTE, LLC

v.

KATZ, ABOSCH, WINDESHEIM,
GERSHMAN & FREEDMAN, P.A., ET AL.

_____

Berger,
Friedman,
Adkins, Sally D.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Adkins, J.

_____

Filed:  September 30, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In 1978, the Maryland Court of Appeals adopted the *Frye* standard for expert testimony, which allowed admission of an expert's testimony if the basis of that opinion "ha[d] gained general acceptance in the particular field in which it belongs." *Reed v. State*, 283 Md. 374, 381 (1978) (quoting *Frye v. U.S.*, 293 F. 1013, 1014 (D.C. Cir. 1923)). Thus, Maryland's *Frye-Reed* standard was born. During its tenure as the evidentiary standard for expert testimony admission in Maryland, the Supreme Court adopted a new standard for admission of scientific expert testimony in federal courts, commonly referred to as the *Daubert*[1] standard. Rather than focusing on the general acceptance of the expert's methodology—like in *Frye*—the *Daubert* standard focuses on the reliability of the methodology. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993).

The Supreme Court later expanded the reach of *Daubert* by applying the standard to admission of expert testimony that was non-scientific in nature. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The supermajority of states had already jumped aboard the *Daubert* train when Maryland followed suit. In 2020, our Court of Appeals overruled *Reed v. State* and adopted *Daubert* as the new standard for admission of expert testimony in Maryland. *Rochkind v. Stevenson*, 471 Md. 1, 5 (2020). Although Maryland courts had used a *"Frye-Reed* Plus" standard[2]—which considered some of the *Daubert* factors—applying the new *Daubert-Rochkind* standard and sifting through the thousands

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).
[2] "In the forty years that followed *Reed*, Maryland experienced a jurisprudential drift: the *Frye-Reed* standard announced in 1978 slowly morphed into a "*Frye-Reed* Plus" standard, implicitly and explicitly relying on and adopting several *Daubert* principles." *Rochkind v. Stevenson*, 471 Md. 1, 5 (2020).

of cases applying the *Daubert* standard may pose a challenge to circuit courts—as it did in the case at hand.

Parkway Neuroscience and Spine Institute, LLC ("PNSI" or "Appellant") brought suit against Katz, Abosch, Windesheim, Gershman & Freedman, P.A. ("Katz Abosch") and Mark Rapson (collectively, "Appellees")—its previous accounting firm and main accountant. As a remedy, PNSI is seeking lost profits damages. In order to establish lost profits damages, PNSI proffered the expert testimony of Meghan Cardell, a Certified Public Accountant ("CPA"). Appellees moved to exclude Ms. Cardell's testimony—asserting that the methodology she employed was unreliable—and to strike the lost profits claim. After a *Daubert* hearing, the Circuit Court for Howard County agreed with Appellees and granted their motion to exclude Ms. Cardell's testimony and strike the lost profits claim. The circuit court—over PNSI's opposition—granted the Appellees' motion for summary judgment on all remaining counts. PNSI timely appealed.

PNSI presents us with the following questions:

1. Did the Trial Court Abuse its Discretion in Granting Defendants' Renewed Motion to Strike Plaintiff's Lost Profits Claim and Exclude Plaintiff's Experts Based on New *Daubert* Standard and Barring Meghan Cardell from Presenting Expert Testimony Regarding PNSI's Lost Profits?

2. Did the Trial Court Erroneously Conclude that Ms. Cardell was not Qualified to Render an Expert Opinion Regarding the Lost Profits of a Medical Practice?

3. Did the Trial Court Erroneously Conclude that Ms. Cardell's Testimony Would Not Assist the Trier of Fact?

For the following reasons, we reverse.

**FACTS AND PROCEDURAL HISTORY**

PNSI is a mixed-specialty medical practice whose practitioners provide treatment for brain, spine, and peripheral nervous system disorders. Starting in 2011, PNSI began to expand its operation with the hiring of more physicians and support staff. Between 2013 and 2014, PNSI had ten physician members who owned the practice. Since none of the members had the necessary background in finance and accounting, PNSI entered into a written agreement in October 2013 with Katz Abosch to provide tax, accounting, "and financial guidance and direction to help PNSI continue to grow its practice."

Appellee, Mark Rapson, is a CPA and Chair of Katz Abosch's Medical Services Group. Mr. Rapson—assisted by the CEO of Katz Abosch and another senior accountant—was in charge of PNSI's account. PNSI normally reconciled its books at the end of the year, so Appellees allegedly agreed to prepare the reconciliation beginning at the end of 2013. According to Appellant, Katz Abosch recommended that PNSI wait to make its end-of-year reconciliation payments until October 2014. At that time PNSI paid four members a total of $422,897 in reconciliation payments. PNSI alleged that Katz Abosch and Mr. Rapson failed to properly evaluate PNSI's financial position before making this recommendation.

"Between 2012 and 2014, PNSI received payments totaling over $400,000 as part of the Medicare and Medicaid Electronic Health Record (EHR) Incentive Program," which are also referred to as meaningful use payments. These meaningful use payments are subject to audit and recovery. Allegedly on the advice of Katz Abosch and Rapson, PNSI deposited the meaningful use payments in PNSI's general funds for member distribution.

3

Soon after, PNSI was required to repay over $400,000 in meaningful use payments to the government. To do so, PNSI alleged, it had to take out a loan.

According to Appellant, Katz Abosch and Rapson proposed a compensation model to PNSI's board in early 2014. Under this compensation model, each member, regardless of their specialty, was allocated an equal portion of two-thirds of PNSI's net increase or decrease in fixed expenses and a portion of the remaining one-third of PNSI's net increase or decrease in expenses based on that member's net collections for the period. PNSI alleged that this model did not address the unique issues of its mixed medical practice. Nor did it provide a reserve for future expenses or Katz Abosch's annual accounting fees. Despite this, PNSI—allegedly relying on Katz Abosch's advice—adopted the proposed compensation model.

After following Katz Abosch's advice on reconciliation payments, meaningful use payments, compensation models, and future payments, PNSI alleged, it was "deeply in debt." Allegedly, as a result of this debt and Appellees' actions, seven of PNSI's nine members[3] left the practice, causing further financial difficulty and lost profits.

PNSI sued Katz Abosch and Rapson for accountant malpractice and negligent misrepresentation in June 2018. In this suit, PNSI included counts against Katz Abosch for breach of contract and unjust enrichment.

---

[3] PNSI alleged in its complaint that it had ten members between 2013 and 2014 and eight members left as a result of Appellees' conduct between 2015 and 2016. PNSI stated in its brief, however, that seven of its then-nine members left the practice. This discrepancy does not affect the outcome of this decision.

PNSI retained Meghan Cardell as an expert to testify regarding damages and lost profits. In June 2019, Appellees filed a Motion to Compel Certain Depositions and Request for Hearing seeking to depose PNSI's witnesses, including Ms. Cardell. Appellees' motion was denied. In July 2019, Appellees moved to strike PNSI's lost profits claim and exclude Ms. Cardell's testimony. Appellees' motion was again denied. In February 2020, Appellees moved for leave to take certain depositions, including Ms. Cardell's. This too was denied.

When this litigation began in 2018, Maryland followed the *Frye-Reed* standard for admissibility of expert witnesses. The *Frye-Reed* standard required that the principles underlying an expert's opinion be generally accepted within their professional community. *Reed*, 283 Md. at 381 (holding that "before a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field").

In August 2020—as this case was pending—our Court of Appeals overruled *Reed* and adopted the United States Supreme Court's standard set forth in *Daubert. Rochkind*, 471 Md. at 5. "*Daubert* . . . refocuses the attention away from acceptance of a given methodology—although that is not totally removed from the calculus—and centers on the reliability of the methodology used to reach a particular result." *Id.* at 31. The Court set forth the five *Daubert* factors and an additional five factors as follows:

> (1) whether a theory or technique can be (and has been) tested;
> (2) whether a theory or technique has been subjected to peer review and publication;
> (3) whether a particular scientific technique has a known or potential rate of error;

(4) the existence and maintenance of standards and controls; . . .

(5) whether a theory or technique is generally accepted[;] . . . .

(6) whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying;

(7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(8) whether the expert has adequately accounted for obvious alternative explanations;

(9) whether the expert is being as careful as he [or she] would be in his [or her] regular professional work outside his [or her] paid litigation consulting; and

(10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Rochkind*, 471 Md. at 35–36 (citations omitted).

This new standard applies to "'any . . . cases . . . that [were] pending on direct appeal when [the *Rochkind* opinion was] filed, where the relevant question ha[d] been preserved for appellate review.' In this context, the 'relevant question' is whether a trial court erred in admitting or excluding expert testimony under Maryland Rule 5-702 or *Frye-Reed*." *Id.* at 38–39 (internal citations omitted).

Relying on this change to our evidentiary law, Appellees filed a renewed motion to strike PNSI's lost profits claim and exclude Ms. Cardell's expert testimony on May 5, 2021. The circuit court ordered an evidentiary hearing to be conducted on Appellees' renewed motion in light of the new *Daubert-Rochkind* standard and allowed Appellees the opportunity to depose Ms. Cardell. At the hearing, the parties and trial judge questioned Ms. Cardell about her qualifications and how she calculated PNSI's lost profits.

6

Ms. Cardell graduated from the University of Richmond with a Bachelor of Science in Accounting and a Bachelor of Arts in Leadership Studies. She has been a CPA since 2011—having passed all four sections of the CPA exam on her first try—and is also a Certified Fraud Examiner. Ms. Cardell is also a member of the American Institute of Certified Public Accountants and the Association of Certified Fraud Examiners, as well as an associate member of the American Bar Association. She is the Director of her group—Disputes and Investigations Services—at the consulting firm Alvarez and Marsal. Ms. Cardell—through her employer—provides litigation services to various entities, typically about accounting issues, damages, and lost profits calculations. Ms. Cardell has conducted dozens of economic damages calculations throughout her career—the main type of calculation being lost profits calculation. Ms. Cardell testified that she had conducted at least one lost profits analysis regarding a medical practice.

Focusing on methodology, Ms. Cardell explained several well-accepted methods to calculate lost profits and why she chose the "before-and-after" method. She first explained why she did not utilize other popular methodologies. She did not use the "contractual damages" method because such a method is only used when the contract specifies a formula or method to be used if the contract is breached—which was not present in PNSI and Katz Abosch's contract.

Ms. Cardell also considered the "lost business value" or "diminution in value" method. She explained that such a method is used when the alleged harm causes permanent impairment to future earnings of the business. Although Ms. Cardell thinks there may be some evidence of permanent injury due to the loss of doctors and their revenue streams,

7

she believes that over time—by replacing doctors and increasing revenue—the practice may recover.[4]

Another method Ms. Cardell considered, the "yardstick" method, is often used for companies where there is not—or not enough—historical data on lost profits. The yardstick methodology is not applicable here—according to Ms. Cardell—because PNSI has historical profit data to analyze.

Ms. Cardell chose the before-and-after method, which, she said, was the most commonly used method to calculate lost profits. This and the above methods, she said, have been

> commonly used in lost profits calculations, they are written about in literature, and specifically, they are named in what's called the AICPA Practice Aid for calculating lost profits. And that's really the, sort of the guiding handbook for damages experts and accountants who are calculating lost profits.

Ms. Cardell further explained that she has used the before-and-after method "many, many times" and has "seen it used by other experts both in and out of litigation settings to calculate lost profits."

> [MS. CARDELL]: [U]nder the before and after methodology what happens is that the damages expert looks at the Plaintiff's performance in two different periods. The first being what we called the benchmark period or the before period. And that's the period that is unaffected by whatever the alleged harm event, breach is. And then that is [compared] to the after period or the loss period, which is the period that is affected by

---

[4] Ms. Cardell further noted that this methodology is not applicable because the diminution in value method is about future lost profits. Due to the effects of the COVID-19 pandemic, PNSI abandoned its lost profits claims for 2020 through 2025. Cardell subsequently updated her written report to calculate only *actual* lost profits damages from 2015 through 2019.

whatever the alleged harm, breach, or event is.  This methodology essentially calculates what the Plaintiff's profits would have been but for again that alleged breach, harm event.

In this case, the alleged harm event was the exodus of members leaving PNSI's practice.

Ms. Cardell used the exodus of members from PNSI as the benchmark or "before" period —a period reflecting PNSI's profits when all (or most) members were still working at PNSI.  As she testified, the first doctor withdrew in June 2015, a few more doctors at the end of 2015, and the final three or four left in early 2016.  The harm event—the exodus of PNSI members—occurred during the one-year period from June 2015 to June 2016.  Ms. Cardell explained that because it is difficult to look at a half-year to determine profitability, she used 2015 as the before period—or the base period.  Ms. Cardell further clarified why she chose 2015 as the base period.

> [MS. CARDELL]:  So I used 2015 as the before [period], because there was really only [one] doctor who left in June and the others didn't leave until the end of 2015.  So their revenues would have been included in 2015.  So 2015 is the before period.

Ms. Cardell opined that 2015 was a good proxy for what future profits would have been, but for the harm event.

> [MS. CARDELL]:  [T]his business had profits in 2015 it was growing, the practice had been growing they were investing in growth.  The practice had sort of hit its stride in 2015 and if you're looking at sitting in 2015 what does the market look like for this business?  What's going to happen to this, this industry in the future?  You can see a couple things.  One that's important is that this industry is medical care.  It's very different from a consumer good, or some sort of luxury good, or service that might be more subject to swings of consumer preference or economic swings.  We're thinking, we're talking about, you know, folks getting medical care which is

9

something that is needed, these people need medical care to continue to live their lives in a productive way. So it's an industry that's not as open to the swings of consumer preference. Especially this case, when we're talking about such a niche practice where there wasn't much else around to be able to service the patients in the same way.

You also see, if you're sitting in 2015 and this continues to be true today, that the medical industry, the medical specialty industry specifically, was projected to grow. Because we have an aging baby boomer population, we have a prevalence of chronic diseases and chronic issues. And so if you look at the market back in 2015 it would tell you that medical practice specialties and medical practices in general were projected to grow. And so I was able to get comfortable with that that 2015 would be a reasonable proxy for the future. It doesn't even account for the potential growth. I could have grown 2015 over time to say well yes, they were making "X" amount in 2015. But they would have been making "X" plus in '16, '17, '18.

Ms. Cardell noted that she obtained information about PNSI's business from doctors in the practice, as well as the company's accounting manager.

The circuit court asked Ms. Cardell if there was a professional standard for choosing the base period, especially the length of the base period. Ms. Cardell explained that the benchmark can be based on a one-year period, so long as it is a reasonable prophecy for future profits. The judge questioned why Ms. Cardell chose to use 2015 as the base period and not earlier years, such as 2014.

[THE COURT]: Why did you exclude 2014?

[MS. CARDELL]: I didn't use 2014 because the company had been in a period of growing and the expenses, when you are growing a business, the expenses tend to grow which makes it look like you have less profit. So I looked at the revenue trends over time and saw that those were growing. And by 2015 I thought the business had really sort of hit its sweet spot in terms

10

of, they had invested the money they needed to be able to continue that growth in a profitable way.

\* \* \*

[THE COURT]: I mean, the – what occurred in 2014 wasn't unusual, was it?

[MS. CARDELL]: I wouldn't say it was entirely unusual. There will be other expenses. But once you see in 2015 that they were sort of out of that what I call kind of the squeeze period.

[THE COURT]: Uh-huh.

[MS. CARDELL]: And you get to a point where you are profitable. There will be other expenses, but I thought 2015 was a better representation of what that level of expense would be moving forward as compared to 2014.

After considering Ms. Cardell's testimony and each party's arguments, the circuit court granted Appellees' motion and ruled that PNSI did not meet the burden necessary to allow Ms. Cardell's expert testimony at trial. The circuit court was first concerned with Ms. Cardell's lack of experience conducting lost profits calculations for unique medical practices, such as PNSI.

[THE COURT]: [T]his is not your typical ma and pa hardware store kind of business. This is a business model that deals with a medical practice that has alternate streams of revenue that have alternate considerations when trying to determine expenses and things of that nature. And there was nothing about this witness's background that showed that she had any special exposure to this.

In addition to concerns about Ms. Cardell's lack of specialized experience, the circuit court found her selection of 2015 as the base period to be "speculative." The court doubted "the quality of the information that she was using" because she relied heavily on

11

PNSI's assertions and lacked independent sources. The circuit court also questioned the usefulness of Ms. Cardell's testimony to the jury.

The judge distilled his reasons for excluding Ms. Cardell as he walked through the *Daubert-Rochkind* factors.

**Factor One**. The circuit court acknowledged the acceptability of the before-and-after method of calculating lost profits—calling it "old school" and saying it "certainly can be tested." But the court found that Ms. Cardell's calculations in this case could not be tested. It believed that Ms. Cardell made too many subjective decisions and assumptions for the court to determine how to test her calculations—for example, what "economic impact"[5] is and why she chose 2015 as the base year for her calculations.

---

[5] Ms. Cardell explained that the phrase "economic impact" or "financial impact" is a term of art used by experts in her industry to determine the impact that a deduction or adjustment might have on the profitability of the business from an economic perspective. She explained that the phrase is also used outside of litigation, such as in mergers and acquisitions.

> [MS. CARDELL]: I have had, [sic] done work in the past in mergers and acquisitions let's say. So not, not litigation related. And in those situations, when someone's coming in and buying a business they also do a similar normalizing adjustment to normalize the earnings because you don't want to pay somebody for a business for earnings that you are not going to get in the future.
> So it is a, as I said it's a concept, because you want to get the real economics of the business you're buying. So it's not something in my experience that is limited to litigation, it applies across [a] sort of financial principals, economic and financial principles.

Ms. Cardell further noted the economic impact is based solely on accounting records, not causation or what caused lost profits, and was not a part of her analysis.

**Factors Two and Three**. The circuit determined that the peer review factor did not apply in this case. It found that factor three—whether the technique has a high error rate—favored exclusion of Ms. Cardell's testimony. The court noted that Ms. Cardell changed her calculations even though the facts underlying her calculations remained the same. Ms. Cardell revised her calculations to get rid of projected lost profits for January 2020 onward, due to the COVID-19 pandemic. She further updated her calculations a second time shortly before her deposition.

> [MS. CARDELL]: [W]hen I was preparing for my deposition I was re-reviewing all the accounting records and I identified an adjustment, a normalizing adjustment that I thought should be made and I made that adjustment. And that lowered the lost profits number for my client. But I believed it was the right answer to do and right adjustment to make regardless of the impact on the number.
>
> [THE COURT]: I'm sorry, what was this adjustment? Which adjustment are we talking about?
>
> [MS. CARDELL]: [I]f you look on schedule two in 2015 and 2016 you'll see there's a trauma and on call adjustment.
>
> [THE COURT]: Right.
>
> [MS. CARDELL]: For a positive $319,000.00 in 2015. And a negative $395,000.00 in 2016. And that had to do with certain trauma and on call monies that were paid in a year to which they didn't relate. And so to normalize that I shifted the expense into the right year which caused lost profits to be reduced. But I, I believe it was the right answer from an economic perspective.

Ms. Cardell assured the circuit court that she again thoroughly reviewed the documents and details of her calculations so that no other adjustment was likely to be

13

needed in the future. Unmoved, the court considered the calculations to be subjective and subject to error.

**Factor Four**. The court determined that there was limited existence of standards or controls, which favored exclusion. "[T]here was very little evidence of any standards o[r] controls that exist." The court said that Ms. Cardell could not articulate standards for defining "economic impact" or for how to treat member draws in a lost profits calculation.

An interchange between the judge and the expert transpired about treatment of member draws. Ms. Cardell said that these draws are guaranteed payments that each doctor receives, which are made up of salary and include, *inter alia*, revenues from trauma and on-call payments. She opined that a business can decide to distribute its earnings in whatever way it wishes for tax purposes, but that these draws are expenses for the corporation—as the doctors are not going to work for free. The court took issue with this.

> [THE COURT]: I guess there's two ways to look at it, way one is that if I own a business and when I finish paying all my expenses out including my…cashier for widgets if there's $100.00 left if I don't take a penny of it that's a $100.00 profit for my business.
>
> \*        \*        \*
>
> [THE COURT]: It seems to me that there's a disagreement in this case. That if I take $100.00 as the owner of the business one line of thought is the company has made no profit that year because I paid myself $100.00. The other thought seems to be I'm the owner, I'm not entitled to anything. What I get is what I take and it's not an expense, it's not a capital [sic] or anything like that. So it's irrelevant how much my draw is on the profit. The company itself still made $100.00 profits. And if I take $100.00, all of it is still $100.00 profit. If I take $5.00 it's $95.00, you know, it's still $100.00 profit. It seems like there's

14

the struggle in this case like that. For purposes of calculating lost profits in the accounting industry which is it?

Ms. Cardell explained that she talked with another accounting and lost profits expert about the treatment of member draws and has researched industry standards on how to treat member draws. But—according to Ms. Cardell—there is no industry standard for this issue because the question of how to treat salaries and member draws in lost profits calculations depends on the business. Based upon her research and understanding of damages theory, she opined, "if the business makes $100.00 regardless of whether it stays in the business or is given to a shareholder or an owner, or a member, those are still the business's profits."

**Factors Five and Six**. The court agreed that the before-and-after method of calculating lost profits has been generally used by qualified professionals for quite some time. But it decided that factor six favored exclusion because Ms. Cardell developed her calculations in preparation for litigation, not independently.

**Factor Seven.** The court believed that the "unjustifiably extrapolated" factor favored exclusion "if the premise that we're talking about from which the unfounded conclusions roles [sic] would be acceptance of 2015 as the benchmark, as the beginning, as the before."

**Factor Eight**. The circuit court found that this factor—whether the expert accounted for obvious alternative explanations—favored exclusion. The judge criticized Ms. Cardell's failure to provide calculations showing each individual doctor's "inherent ability to generate revenue over the time periods"—in case the jury found that not all doctors left because of defendant's alleged negligence.

15

Ms. Cardell calculated lost profits based on the exodus of members from the practice as a whole instead of calculating the lost profits attributed to each individual member leaving. Ms. Cardell readily acknowledged that her calculations were based on what profits would have been had none of the members left PNSI. The circuit court opined that if the jury found—for example—that only four of the seven members left because of Appellees' actions, then Appellees should only be liable for lost profits associated with those four members leaving, not all seven. Based upon this hypothetical, the circuit court expressed doubt about the usefulness of Ms. Cardell's testimony to the jury.

The circuit court also found fault—under factor eight—with Ms. Cardell's failure to opine on whether insurance reimbursement rates affected lost profits. Insurance reimbursement rates are the amount that PNSI—or its members—receive from an insurance company for services it rendered. These reimbursement rates may differ between Medicare/Medicaid and vary based on federal legislation passed. Ms. Cardell explained that she did not account for changes in reimbursement rates because, even though they may have declined slightly, access to healthcare increased. Such increased access, she said, would offset any declines in reimbursement rates.

**Factor Nine.** The circuit court determined that this factor did not apply—or seemingly favored inclusion of Ms. Cardell's testimony—because the court had "no reason to think that she blew [her calculations and testimony] off as an inconsequential project" and found that "she took this very seriously."

**Factor Ten**. In the trial judge's mind, "whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would

16

give"—favored exclusion because "the mere fact the [calculations] changed in June of [2021] for fully subjective reasons" and "had nothing to do with any new information" made "the whole reliability even that much more suspect."

Considering these ten factors, the circuit court granted Appellees' motion to exclude Ms. Cardell's testimony and motion to strike PNSI's lost profits claim. Appellees moved for summary judgment on the remaining counts, which the court granted.[6] This timely appeal followed.

## DISCUSSION

"[T]he *Daubert* hearing's purpose is only to determine the admissibility of expert evidence; it is not to determine 'whether such evidence is sufficient with respect to a matter upon which the plaintiff has the burden of proof.'" *Gannon v. U.S.*, 571 F. Supp. 2d 615, 621 (E.D. Pa. 2007) (citation omitted). "[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute ground for reversal." *Rochkind*, 471 Md. at 10 (quoting *Roy v. Dackman*, 445 Md. 23, 38–39 (2015)). We review exclusion of an expert's testimony for abuse of discretion. *Rochkind*, 471 Md. at 10–11 (citing *Blackwell v. Wyeth*, 408 Md. 575, 618 (2009)). "Such a ruling, however, may be reversed on appeal if it is founded on an error of law or some serious mistake, or if the trial court clearly abused its discretion." *Id.* at 11 (quoting *Sippio v. State*, 350 Md. 633, 648 (1998)). As the Court of

---

[6] PNSI stipulated to the dismissal of its unjust enrichment claim. Appellees moved for summary judgment on the counts of accountant malpractice, negligent misrepresentation, and breach of contract.

17

Appeals recently said, "The standard of appellate review for *Frye-Reed* determinations is de novo." *Frankel v. Deane*, No. 43, Sept. Term 2021, __ Md. __, slip op. at 17 (filed Aug. 25, 2022); *see also Williams v. State*, 251 Md. App. 523, 546 (2021) (citations omitted) ("[E]ven with respect to a discretionary matter, a trial court must exercise its discretion in accordance with correct legal standards."), *aff'd*, 478 Md. 99 (2022); *In re Guardianship of Dory*, 244 Md. App. 177, 203 (2019) (quoting *Barrett v. Barrett*, 240 Md. App. 581, 591 (2019)) (holding that the circuit court's failure to consider the proper legal standard in reaching its decision was an abuse of discretion).

PNSI asserts that the circuit court erred and/or abused its discretion in excluding Ms. Cardell's lost profits testimony. It avers that the errors occurred in (1) finding Ms. Cardell unqualified to render an opinion regarding lost profits of its medical practice, (2) finding Ms. Cardell's selection of the 2015 base year unreliable, (3) and assessing the soundness of Ms. Cardell's data and assumptions as impacting admissibility rather than weight. We will address each of these assertions in turn.

*Ms. Cardell's qualifications to testify as an expert in this case*

The circuit court found that Ms. Cardell "has the capacity to be an expert in some matters," but not in this matter. Although Ms. Cardell has experience calculating lost profits in various industries, the circuit court said, PNSI is "a medical practice that has alternate streams of revenue that have alternate considerations when trying to determine expenses and things of that nature. And there was nothing about [Ms. Cardell's] background that showed that she had any special exposure to this." Based on her testimony, Ms. Cardell could recall conducting a prior lost profits calculation for only one

medical practice. The circuit court stated it did not know "what qualifie[d]" Ms. Cardell to make judgments regarding this "fairly specialized LLC or type of work."

Appellant asserts that the circuit court erred in considering Ms. Cardell's experience with medical practices at the admissibility stage. Admissibility of expert testimony is often broken down into three factors: (1) whether the expert, based on her skills, knowledge, experience, and training, is qualified; (2) whether her methods are reliable; and (3) whether there is a sufficient factual basis to support her testimony and assist the trier of fact. *See, e.g.*, Md. Rule 5-702; *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850–51 (11th Cir. 2021); *Orbital Eng'g, Inc. v. Buchko*, 578 F. Supp. 3d 727, 731 (W.D. Pa. 2022).

The circuit court did not challenge Ms. Cardell's qualifications as a CPA or her experience evaluating businesses and their profits. Yet the court decided that a medical practice like PNSI was so different from other small businesses that a CPA must possess specialized training or experience before qualifying to testify as to its lost profits. This conclusion is at odds with decisions applying *Daubert*. *See Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (holding that the expert economist's lack of experience in real estate development goes "more towards the foundation" of the witness's testimony than his qualifications to calculate damages). We agree with the rationale of the Eleventh Circuit and believe it applies equally to a CPA testifying about lost profits. *See also Moore*, 995 F.3d at 853 (holding that, in a products liability action, the expert surgeon's inexperience with particular surgical tools goes only to reliability and not his qualification to testify as to causation); *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858

19

F. Supp. 2d 505, 512 (D. Md. 2012) (holding that any issues with the expert's qualifications in relation to an opposing expert's testimony may be explored on cross examination).

"[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996) (citation omitted). "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Smolow v. Hafer*, 513 F. Supp. 2d 418, 426 (E.D. Pa. 2007) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997)).

Appellees have not cited any decisions supporting the assertion that a trial court—in its gatekeeper role under *Daubert*—acts properly in excluding the testimony of a qualified CPA with significant lost profits expertise on grounds that the expert's experience with such analysis had only included one medical practice. We do not accept the premise that knowledge of the accounting principles and tax laws required to analyze profits for a limited liability company medical practice differs so markedly from that required for other small businesses—especially "pass-through" entities like an LLC—that the proffered CPA must demonstrate particularized experience in medical practice analysis. *See, e.g.*, *Smolow*, 513 F. Supp. 2d at 425–26; *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (citing *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 580 (5th Cir. 1985)) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned [to] that opinion rather than its admissibility and should be left for

20

the jury's consideration."). Here, we are dealing with generally accepted accounting principles and tax law, not cutting-edge technical developments or scientific theories.[7] Because the circuit court found Ms. Cardell unqualified to testify as an expert due to her lack of medical industry experience, it imposed an unduly high standard. This was error. A CPA with Ms. Cardell's experience certainly has the mathematical and analytical skills to take these specialties into account if she thought it necessary. Her lack of specialized experience is ripe for cross-examination at trial.

The circuit court also took issue with the reliability of—what it considered— Ms. Cardell's methods. We next turn to those issues to determine if the circuit court had a sustainable alternative ground for excluding the expert testimony.

*Methodology employed*

The circuit court decided that Ms. Cardell's methodology was unreliable under the *Daubert-Rochkind* standard. In its bench opinion, the circuit court expressed five weaknesses it saw in Ms. Cardell's analysis: (1) using 2015 as the base year; (2) failing to consider changes in insurance reimbursement rates; (3) failing to articulate standards to

---

[7] Generally accepted accounting principles (GAAP) are regularly used in the accounting field and have been recognized in Maryland and other courts. *See, e.g.*, *Dabbs v. Anne Arundel Cnty.*, 458 Md. 331, 360 (2018); *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1009 (S.D. Cal. 2000) ("[GAAP] comprise a set of basic postulates and broad accounting principles pertaining to business enterprises. These principles, approved by the American Institute of Certified Public Accountants ('AICPA'), establish guidelines for measuring, recording and classifying the transactions of a business entity."), *aff'd sub nom.*, *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1304 (C.D. Cal. 1996) ("[GAAP] are the conventions, rules, and procedures that constitute the professional standards of the accounting profession.").

21

define economic impact and treat member draws; (4) changing her calculations while the underlying facts remained the same; and (5) failing to calculate lost profits for each individual member leaving PNSI.[8]  Many of the circuit court's qualms with Ms. Cardell's calculations overlap with one another, but we will address them separately in turn.

   a. *Selection of 2015 as the base year*

The circuit court considered Ms. Cardell's selection of 2015 as the base year for her lost profits calculations to be speculative.  It elaborated by stating "there wasn't any reason to believe that she had the training or the experience or the information to [select 2015 as the base year], it just seems speculative to me."  In applying the *Daubert* factors, the court noted that "there's nothing [the circuit court had] been presented from which . . . the factors that she used in selecting 2015 could be tested."

"An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."  *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) (citing Fed. R. Evid. 702).  "Unless the information or assumptions that plaintiff's expert relied on were 'so unrealistic and

---

[8] Appellees, relying in part on this Court's recent opinion in *Tallant v. State*, 254 Md. App. 665 (2022), assert that since PNSI did not fully address the issues of reimbursement rates and treatment of member draws in its initial brief, PNSI waived any challenge to the circuit court's findings on those issues.  We disagree.  In *Tallant*, we concluded that Appellant lacked in his initial brief and reply brief any support for his request for a different trial judge or for the circuit court's decision to close the courtroom during a proceeding.  254 Md. App. at 689–90.  Here, PNSI adequately briefed and proposed legal arguments on the circuit court's alleged errors and abuses of discretion in determining the reliability of Ms. Cardell's methodology in its initial brief.  Additionally, unlike in *Tallant*, PNSI specifically addressed sub-issues of reliability regarding member draws and reimbursement rates in its reply brief.  Therefore, we do not agree that PNSI waived any arguments related to these specific reliability sub-issues.

contradictory as to suggest bad faith,' inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015) (cleaned up) (quoting *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010)).

Here, the circuit court heavily relied on *CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815 (S.D. Ind. 2012) to support excluding Ms. Cardell's testimony for selecting 2015 as the base year for her lost profit calculations. Careful examination of that case reveals important distinctions that demonstrate that this reliance was misplaced. CDW LLC's expert asserted that "but for NETech's alleged wrongful conduct," its Indianapolis office would have grown in revenue at the same mean rates experienced by the other CDW branches in the Great Lakes region. *CDW LLC*, 906 F. Supp. 2d at 823. CDW's expert used the "yardstick" approach for calculating lost profits for the Indianapolis branch. *Id.* at 824. In using this approach, the expert took the average revenue growth of the other CDW Great Lakes branches to project what the profits of the Indianapolis office should have been—but for defendant's conduct. *See id.* The expert did not compare the Indianapolis branch to its own previous growth rates or "the actual experience of any other business entity." *Id.* The *CDW LLC* court took issue with this because each branch showed "wide variations in branch performance from year to year" and the expert "made no (and did not rely on any) economic analysis of the Indianapolis market or any other market." *Id.*

The *CDW LLC* court noted that the "expert's choice in data sampling"—the sufficiency of the data—"is at the heart of his methodology." *Id.* Unlike CDW's expert,

Ms. Cardell relied on PNSI's accounting records, not records from another comparable entity. She examined PNSI's profits and losses from 2010 and onward and explained why she chose 2015, and not previous years, as the base year for her calculations.

> [THE COURT]: I mean isn't there some understanding within your profession that you have to use a hundred years or five years or something [as the benchmark]? I mean, something period, or is any expert free to pick…as short or as long a period as they feel they want to?
>
> [MS. CARDELL]: So what we are told is to, to pick a before or a benchmark number that is going to be a prophecy for the future. And that can be determined based on one year. That can be determined based on an average if that's applicable. But if for example you have past years that aren't going to be representative of the future by including those in your before period you are, you are not getting a reasonable picture of what the earnings would have been.

Unlike the expert in *CDW LLC*, Ms. Cardell did not sample data from other markets; she relied on PNSI's own data to determine the benchmark. She provided an explanation as to why 2015 was the appropriate base year, and unless the data and assumptions she made were "so unrealistic and contradictory as to suggest bad faith," her testimony should be admissible. *See Washington*, 105 F. Supp. 3d at 306 (quoting *R.F.M.A.S., Inc.*, 748 F. Supp. 2d at 269). It is not so unrealistic or contradictory as to suggest bad faith when an experienced CPA opines that a company reached a reasonably predictable level of profits in a particular year after several years of enduring extra expenses during a growth period. The court, acting as gatekeeper, acts outside of its role when it second guesses the expert's choice of data to rely on when applying the indisputably legitimate choice of methodology—the before-and-after method. *See Packgen v. Berry Plastics Corp.*, 46 F.

Supp. 3d. 92, 111 (D. Me. 2014) (denying a motion to exclude testimony of a CPA, despite projecting a 10 years' lost profits period based on only one profitable year, opining that "legal sufficiency of the evidence supporting a ten-year loss period" is not a *Daubert* issue); *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1132 (M.D. Fla. 2007) (citation omitted) ("Errors in an expert's application of a reliable method go to the credibility of an expert's opinion rather than the opinion's reliability under *Daubert*."). Therefore, the circuit court erred.

b. *Other data and assumptions*

Another prominent concern of the circuit court was Ms. Cardell's failure to consider alternatives for lost profits, such as change in insurance reimbursement rates. We agree that an expert's failure to consider alternative explanations can be grounds for excluding her opinions. *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) (upholding the exclusion of an expert's testimony for failing to disclose what software and data he used and how alternative explanations were ruled out); *Waytec Elecs. Corp. v. Rohm and Haas Elec. Materials, LLC*, 459 F. Supp. 2d 480, 489 (W.D. Va. 2006) (citations omitted) ("[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony."). *But see Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y 2002) (citation omitted) (holding that an expert need not "categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible").

25

This case, however, is less about failure to consider alternatives for what caused lost profits—since Ms. Cardell is not a causation expert—and more about alleged failure to calculate lost profits properly, or at least calculate and present to the court all possible variables. Ms. Cardell did not include in her calculations the possible changes in insurance reimbursement rates for PNSI from 2016 to 2019. When presented with an unauthenticated chart of reimbursement rates at the evidentiary hearing, Ms. Cardell noted that those reimbursement rates were declining, but said that these decreases would be offset by the market increase caused by more access in the general population to healthcare, which would increase revenue overall.

Whether Ms. Cardell failed to consider reimbursement rates is not an issue with the methodology—the before-and-after method. Rather, it is an issue with the soundness of the data she used to reach her conclusion.[9] The Seventh Circuit in *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796 (7th Cir. 2013), addressed a remarkably similar expert admissibility issue. In *Manpower*, one party offered a forensic accounting expert, Mr. Sullivan, to calculate lost profits. 732 F.3d at 801. Sullivan used the before-and-after method to calculate lost profits. *Id.* at 803. The district court was concerned by Sullivan choosing "such a short base period for calculating lost profits." *Id.* at 802.

Sullivan chose a base period of five months—which he used to calculate the projected revenue growth rate in the after period. *See id.* at 801–02. He used an estimated

---

[9] Many of the issues overlap in this section. Analyzing reimbursement rates, selecting the base year, and relying on data from and conversations with PNSI all are issues with the soundness of the data.

26

growth rate of 7.76%—calculated by comparing the company's revenues from January to May 2006 (before the "collapse") to the total revenues earned in the same five-month period in 2005. *Id.* at 801. The district court thought that the growth rate calculated from the chosen period was not representative of the company's historical growth rate. *Id.* at 801–02.[10]

The expert reviewed the company's financial data from 2003 forward and concluded that the company turned a corner by the end of 2005. *Id.* at 802. In deciding to use January to May 2006 as the base period, Mr. Sullivan relied on statements made by the company managers. *Id.* Sullivan further noted that the growth rate during this period was a more conservative estimate than if he had used a longer 12- or 14-month period which would have yielded growth rates of 20.1% and 13.67%, respectively. *Id.* at 803.

Despite Sullivan's growth rate extrapolation being "the simplest and most frequently used revenue forecasting method," the district court found his methods unreliable and excluded his testimony. *Id.* at 802. The district court criticized Sullivan's reliance on conversations with the company managers, using such a short base period, and failing to consider other indicators that may have impacted the growth rate—thus finding that his calculations were based on assumptions that caused his calculations to be deemed unreliable. *Id.* The Seventh Circuit reversed. *Id.* at 812. It concluded that Sullivan's expert opinion—"although not bulletproof—[was] sufficiently reliable to present to a jury"

---

[10] The company's average annual growth rate from 2003 to 2009 was negative 4.79% and only 3.8% from January 2005 to May 2006. *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 801–02 (2013).

and the district court abused its discretion by "exercis[ing] its gatekeeping role under *Daubert* with too much vigor." *Id.* at 805.

Although judges have much flexibility and leeway in determining reliability of expert testimony, reliability—according to *Manpower*—"is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Id.* at 806.[11] The *Manpower* court relied on another Seventh Circuit decision, *Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000), to explain the same concept: "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Manpower*, 732 F.3d at 806 (quoting *Smith*, 215 F.3d at 718).

Similarly, the Maryland Rule 5-702 requirement that there is "a sufficient factual basis" supporting the testimony does not justify a trial court's exclusion of such testimony based upon "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions." *See Manpower*, 732 F.3d at 806. The requirement

---

[11] Our Court of Appeals recently cited *Manpower* in describing the gatekeeping function under Rule 5-702. *State v. Matthews*, 479 Md. 278, 316 (2022) ("For these reasons, in exercising its gatekeeping function under Rule 5-702, a trial court generally should be most concerned about the reliability of an expert's methodology. Once a trial court is satisfied that an expert has applied a reliable methodology to an adequate supply of data, the court should not exclude the expert's testimony merely because the court is concerned that the expert's particular conclusions may be inaccurate. *See Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) . . . ."). In *Matthews*, the Court of Appeals concluded that the trial court did not abuse its discretion in admitting the expert's testimony. *Matthews*, 479 Md. at 325.

28

outlined in Md. Rule 5-702 means that the "sufficient facts [must] underlie the expert's opinions that indicate the use of 'reliable principles and methodology in support of the expert's conclusions' so that the opinion constitutes more than mere speculation or conjecture." *Exxon Mobil Corp. v. Ford*, 433 Md. 426, 478–81 (2013) (quoting *Giant Food, Inc. v. Booker*, 152 Md. App. 166, 182–83, (2003)) (upholding admission of testimony on diminution in value of real property despite the expert appraiser having ignored sales of nearby properties).

Ms. Cardell calculated lost profits using the company's actual accounting data and used a base period before the exodus of most members occurred. "[T]hese are the kinds of data that accountants normally rely on in calculating future earnings [and lost profits]." *See Manpower*, 732 F.3d at 809. Additionally, "[i]t may be true that using specific variables"—such as insurance reimbursement rates—"would have resulted in a . . . more accurate figure. However, . . . . whatever shortcomings existed in [the expert's] calculations [goes] to the weight, not the admissibility of the testimony." *See Cummings v. Standard Reg. Co.*, 265 F.3d 56, 65 (1st Cir. 2001).

Because the circuit court excluded Ms. Cardell's testimony—in part—based on missing variables, the court misapplied the law and thus abused its discretion and usurped the role of the jury. *See Manpower*, 732 F.3d at 806 ("[A] court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed."); Jack B. Weinstein, Weinstein's Federal Evidence 702.05[2][a] (2d ed. 1997) ("[A]nalytical

29

focus should be on principles and methodology. Trial courts may not reject expert testimony simply because they disagree with the conclusions reached by the witness.").

c. *Treatment of member draws*

The circuit court also criticized Ms. Cardell's "lack of industry standards" for treatment of the draws that each individual member takes from PNSI.[12] Ms. Cardell noted that the member draws are part of what accountants consider "guaranteed payments."

> [MS. CARDELL]: The guaranteed payments, in my review are made of two things, the draws that the doctors receive which are essentially salary. And then for some doctors it includes the trauma and on call payments for revenues that they earned working that.

Regardless of whether the owners elected to take a draw or if that money stayed in the business, the money generated by medical services was still a profit to the business, according to Ms. Cardell.

The circuit court suggested that the treatment of member draws is a "pretty basic issue" and seems to be "capable of rearing its head in every case" that involves such owner draws. We agree that such an issue may arise again, but that is because treatment of member draws and classifying fixed and variable expenses are fact-laden endeavors. The trial court seemed to recognize this at one point when—in response to defense counsel's cross-examination of Ms. Cardell on this point—it said:

---

[12] The circuit court also found that Ms. Cardell cited no industry standards in defining the term "economic impact." Defining such a term does not impact the reliability of the methodology Ms. Cardell employed. The issue here is PNSI's lost profits. Whether Cardell correctly used the broader concept of economic impact—which focuses on effects upon other business and the relevant economy—is not material.

30

> [Ms. Cardell's] view is it doesn't matter how much these Plaintiffs took out, it doesn't affect the profits. . . . [I]t may have some legal effect at some point.  [Your line of questioning] may mean a lot to a jury, but I'm not really sure where it fits into this hearing.

Yet in announcing its ruling, the trial court appeared to disagree with Ms. Cardell's conclusion about how a CPA, in calculating a business's lost profits, should deal with correlating reduced expenses.  It also required Ms. Cardell to cite a specific accounting rule governing these particular circumstances and implied that her own professional opinion based on training, certification, and experience was insufficient.  Ms. Cardell testified that she had researched the accounting literature and determined that there was no established rule on this issue.  In this context, a court's belief that an experienced CPA's judgment call based on accounting principles is not sufficient and that there should be an explicit, citable accounting rule, has no place in a *Daubert-Rochkind* ruling.

The Eastern District of Missouri addressed such an issue in the context of a *Daubert* hearing.  *See OCI Chem. Corp. v. Am. Railcar Ind., Inc.*, No. 4:05CV1506FRB, 2009 WL 890525, at *1 (E.D. Mo. Mar. 30, 2009).[13]  In *OCI Chem.*, the defendant sought to exclude

---

[13] The Court of Special Appeals allows the citation of unreported opinions from federal courts and courts of other states as long as the jurisdiction where it was issued would allow its citation for persuasive value in its courts. *Gambrill v. Bd. of Ed. Of Dorchester Cnty.*, 252 Md. App. 342, 352 n.6 (2021), *rev'd on other grounds*, No. 34, Sept. Term 2021, __ Md. __ (2022) (filed Aug. 26, 2022); *CX Reinsurance Co. Ltd. v. Johnson*, 252 Md. App. 393, 414 n.7 (2021), *rev'd on other grounds*, No. 47, Sept. Term 2021, __ Md. __ (2022) (filed Aug. 29, 2022). The Eastern District of Missouri permits citation and reliance on its unpublished opinions under certain circumstances. *See Federal Trade Commission v. Neiswonger*, No. 4:96CV2225SNLJ, 2008 WL 11434564, at *1 n.3 (E.D. Mo. Oct. 16, 2008) ("Although it is not the Court's usual practice to cite unpublished opinion, it does so in circumstances wherein the unpublished opinion offers legal guidance to the Court in

31

plaintiff's lost profits expert—Kenneth Giambagno—under *Daubert* because the defendant

asserted Mr. Giambagno "failed to deduct all applicable expenses." *Id.* at *2.

> In general, in calculating lost profits damages, lost revenue is estimated, and overhead expenses tied to the production of that income are deducted from the estimated lost revenue. Overhead expenses include both fixed and variable expenses. Fixed expenses are the continuous expenses of the business that are incurred regardless of the loss of a portion of the business, for example rent, taxes, and administrative salaries. Variables expenses, also called direct expenses, are costs directly linked to the volume of business.

*Id.* at *3 (quoting *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50,

55 (Mo. 2005) (en banc)).

*OCI Chem.* held that whether expenses are fixed or variable is a factual issue to be

determined on a case-by-case basis. *See* 2009 WL 890525, at *3. The defendant disagreed

with some of Mr. Giambagno's determinations on what costs he treated as variable

expenses. *Id.* at *4. Because the treatment of expenses is a factual issue, it goes to the

credibility of the witness and "such [a] dispute may be brought out at trial by the defendant

through cross-examination and the presentation of contrary evidence." *Id.*

Just like in *OCI Chem.*, Ms. Cardell used an approved methodology—the before-

and-after method. She relied on the actual records maintained by PNSI for the period in

question, which enhances reliability. Whether Ms. Cardell should have deducted the

---

reaching a determination on the issue(s) at hand."); *Burke v. Univar USA, Inc.*, 354 F. Supp. 2d 1047, 1051 n.4 (E.D. Mo. 2005) ("Although it is not the Court's customary practice to cite to unpublished opinions, it does so only in those instances wherein the unpublished opinion(s) addresses a significant issue before the Court and contributes to the Court's decision in a meaningful way."). We address *OCI Chem.* for those reasons.

member draws from the projected profits is something the Appellees can attack during cross-examination before a jury—but not at the *Daubert-Rochkind* hearing. Like the Eastern District of Missouri, we consider this to be a fact-laden issue—involving credibility, not reliability. *See id.* at *2. As such, under *Daubert-Rochkind,* the court's criticism was misplaced.[14] *See Acker v. Burlington N. and Santa Fe Ry. Co.*, 347 F. Supp. 2d 1025, 1031 (D. Kan. 2004) ("Although [the expert] does not distinguish hard expenses from lost profits, the court fails to see how this makes his testimony unreliable.").

### d. Correction of calculations

The circuit court found Ms. Cardell's testimony to be unreliable under the third *Daubert* factor—a "known or potential rate of error." The court decided Ms. Cardell's calculations had a known or potential rate of error because she corrected her calculations.[15] After reviewing her work in preparation for her deposition, Ms. Cardell made a "normalizing adjustment" to her calculations that lowered lost profits, thus reducing the plaintiffs' claim. The underlying data did not change—instead she merely corrected a mistake in her calculations. The circuit court determined that because Ms. Cardell changed her calculations when the underlying facts remained the same, her calculations had a high rate of error.

---

[14] We are not deciding that a trial court would be barred from ruling against a plaintiff on grounds that damages had not been proven with sufficient certainty to go to a jury on a motion under Maryland Rule 2-519 or 2-532.

[15] First, Ms. Cardell updated her calculations to restrict the period of lost profits through December 31, 2019, because the COVID-19 pandemic would have affected profits from 2020 onward. The circuit court did not take issue with this change.

In doing so, the circuit court misinterpreted the third prong of *Daubert*. The error rate that *Daubert* speaks of is the rate of unknown errors in the methodology employed, not an "error *correction* rate." *Crowley v. Chait*, 322 F. Supp. 2d 530, 540 (D.N.J. 2004) (emphasis in original).

> *Daubert* does not require that an expert's testimony be excluded simply because [she] admitted and corrected [her] own mistakes or retracted [her] false statements. In fact, one of the very purposes of a *Daubert* hearing . . . is to give experts a chance to explain and even correct errors that they made in their reports. . . . There is no stigma attached to such error correction, nor should there be. If anything, it strengthens the quality of the expert report. The known or potential rate of error discussed in the third prong of *Daubert* more likely refers to the rate at which unknowable mistakes that cannot be corrected have been made in a data or statistical set; the known or potential rate of error then serves as an indication of how reliable or unreliable that data may be.

*Id.*; *see also Moe v. Grinnell Coll.*, 547 F. Supp. 3d 841, 850 (S.D. Iowa 2021) (analyzing the known or potential rate of error rate of the techniques and methods used); *Janopoulos v. Harvey L. Walner & Assocs., Ltd.*, 866 F. Supp. 1086, 1097 (N.D. Ill. 1994) (holding that the expert satisfied the *Daubert* standard even though he may not have known "the known or potential rate of error" because the expert's methods were generally accepted). We agree with these cases. Any other rule would be a disincentive to disclose and explain errors.

The circuit court found a high rate of error even though Ms. Cardell employed a generally accepted methodology in this case and relied on accounting data from PNSI itself when conducting her lost profits calculation. This was an error in applying the *Daubert-Rochkind* standard.

34

*e. Failure to calculate lost profits attributed to each individual member of PNSI*

The circuit court took issue with Ms. Cardell calculating lost profits because of all seven doctors leaving, without also calculating profits lost with respect to each individual doctor leaving.

> [THE COURT]: Well let me cut to what's interesting to me. Let's say you testified Plaintiff's 2, your schedules go into evidence. Your testimony goes swell, it mirrors what you did today, nothing new. And then the jury comes back and finds that three of the seven doctors left for reasons totally unrelated to the Defendants while four of the seven left for reasons caused by the Defendants?
> What good is your testimony . . . [to] the jury in terms of trying to figure out what that lost profit is? Because it wouldn't be fair to make the Defendants pay for all seven since they only drove out three, or they only drove out four under my hypothetical. How do you take into account that maybe all seven didn't leave because of the Defendants?

The circuit court brought up similar issues with causation and PNSI's damages theory throughout the *Daubert-Rochkind* hearing. For example, the circuit court asked Ms. Cardell, "can you say from your examination of the records that the only reason for the reduction [in lost profits] is the doctor leaving as opposed to other sources such as the reimbursement rate from the insurance company declining?" Ms. Cardell emphasized that she was not a causation expert in this case and did not have an opinion on causation. She further explained that she "looked at the practice wholistically. So not on a doctor-by-doctor basis."

"The purpose of a *Daubert* hearing is to filter out expert evidence based upon unreliable expert evidence." *Lenawee Cnty. v. Wagley*, 836 N.W.2d 193, 208 (Mich. Ct. App. 2013).

> A *Daubert*-type hearing . . . is *not* a judicial search for truth. . . . The inquiry is not into whether an expert's opinion is necessarily correct or universally accepted. The inquiry is into whether the opinion is rationally derived from a sound foundation.

*Id.* at 208–09 (emphasis in original) (quoting *Chapin v. A & L Parts, Inc.*, 732 N.W.2d 578, 587 (Mich. Ct. App. 2007)); *see also Gannon*, 571 F. Supp. 2d at 621. "Thus, the question here is not whether damages for lost profits are proper, but whether the amount of lost profits to which [Ms. Cardell] contends [PNSI] is entitled is founded on a judicially-recognized methodology." *See Natchez Reg'l Med. Ctr. v. Quorum Health Res., LLC*, 879 F. Supp. 2d 556, 579 (S.D. Miss. 2012) (stating that the before-and-after and yardstick methodologies are reliable).

The circuit court—by looking to causation of lost profits—circumvented the purpose of a *Daubert* hearing. The purpose—in this case—is to determine whether Ms. Cardell used reliable methodology in coming to her conclusion—not whether PNSI met its burden of proof on whether Appellees' conduct caused its lost profits. *See, e.g.*, *Gannon*, 571 F. Supp. 2d at 621; *Natchez Reg'l*, 879 F. Supp. 2d at 579. The circuit court can hear causal evidence and decide later whether there is sufficient evidence of a causal connection to submit to the jury. *See Jacobs v. Flynn*, 131 Md. App. 342, 355 (2000) (citing *Hughes v. Carter*, 236 Md. 484, 486 (1964)). The circuit court will be able to rule on such causation issues through a Rule 2-519, 2-532, or other motion. And Ms. Cardell's failure to compute the lost profits on a per-doctor basis falls decidedly within the realm of cross-examination or refutation by opposing expert. The circuit court therefore erred in finding Ms. Cardell's

testimony unreliable because she did not calculate lost profits for each individual member leaving.

*Analytical Gap*

Considering the Court of Appeals' recent *Daubert-Rochkind* opinion in *State v. Matthews*, 479 Md. 278 (2022), Appellees ask us to find that—even if Ms. Cardell's methodology is reliable and there is an adequate supply of data—her calculations are full of "analytical gaps," and therefore her testimony should still be excluded. Appellees assert that Ms. Cardell using 2015 as the base year, failing to account for changes in reimbursement rates, and failing to articulate a standard for treatment of member draws constitute analytical gaps. We do not agree.

"An 'analytical gap' typically occurs as a result of 'the failure by the expert witness to bridge the gap between his or her opinion and the empirical foundation on which the opinion was derived.'" *Matthews*, 479 Md. at 316 (quoting *Savage v. State*, 455 Md. 138, 163 (2017)). The *Matthews* court used the expert testimony in *Savage* as an example of an analytical gap because the defense expert failed to "connect the dots between the results of the psychological tests he had administered on the defendant and his opinion that the defendant was more likely to have greater difficulty controlling his reactions under conditions of chaos and stress." *Id.* at 318 (internal quotations omitted) (citing *Savage*, 455 Md. at 164).

In *Savage*, a trial court barred a neuropsychologist expert from testifying that the defendant—due to a brain injury resulting from previous gunshot wounds to the head— was "untrusting" and "hyper-vigilant to possible threats." 455 Md. at 164. The expert used

37

a reliable methodology—the Personality Assessment Inventory ("PAI") test—but there was an "analytical gap" between the PAI test and the expert's conclusions that the defendant "tends to view the world in untrusting terms." *Id.* at 160–171. The PAI test has been a reliable clinical tool used to determine "diagnosis, symptom severity, level of risk, and treatment planning," as well as being used to "assess factors salient to psycholegal decision making." *Id.* at 167 (quoting Tatiana M. Matlasz et al., *Cognitive status and profile validity on the Personality Assessment Inventory (PAI) in offenders with serious mental illness*, 50 Int'l J.L. & Psychiatry 38, 38–41 (2017)).

The *Savage* court held that use of the PAI test required application of a rigorous and complex protocol, and the expert failed to provide evidence or explanation as to how he reached the conclusion about the defendant using the PAI test. 455 Md. at 169. In this case, to reach her opinion about lost profits based on the before-and-after method, Ms. Cardell faced a far simpler task—without so many complex analytical steps. Ms. Cardell relied on PNSI's own accounting data and explained why she picked 2015 for the base year. First, this reflected the timing of the doctors' exodus. Second, 2015—according to Ms. Cardell—was the most accurate reflection of the LLC's predictable profits because the company had achieved that profitable year after several years of growth. The before-and-after method utilized by Ms. Cardell is clearly connected to the conclusion she reached, not simply based on the *ipse dixit* of the expert. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in . . . *Daubert* . . . requires a . . . court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Issues with the base year, insurance reimbursement rates, and treatment of member draws are not "analytical gaps" between the methodology and the conclusion reached. Rather, they are issues with the actual conclusion reached—a dollar amount measuring lost profits. As explained above, such issues go to weight and credibility of Ms. Cardell's testimony. *See Cummings*, 265 F.3d at 65. Appellees may utilize all the advantages of the adversarial process to challenge Ms. Cardell's lost profit calculation, but—based on the record before us—her testimony should not have been excluded on grounds that her testimony is unreliable, filled with analytical gaps, or would not assist the trier of fact.

## CONCLUSION

The circuit erred in holding that Ms. Cardell was unqualified to testify regarding lost profits due to her lack of experience in a particular industry. The circuit court also erred when it determined that Ms. Cardell's calculations were unreliable because she used 2015 as the base year, failed to consider insurance reimbursement rates, included member draws in PNSI's profits, corrected a mistake in her calculations, and calculated lost profits of PNSI arising from all the doctors departing, rather than each member individually. Not one of these issues, however, affects the reliability of Ms. Cardell's testimony under *Daubert* and *Rochkind*.

The circuit court was troubled with Ms. Cardell's opinion on an accounting issue and whether PNSI could prove that Appellees caused all of PNSI's members to leave. As to the latter issue, Ms. Cardell disclaimed any role as to causation. Excluding Ms. Cardell's testimony on either of these grounds usurps the role of the jury. *See Manpower*, 732 F.3d at 806. When a trial court usurps the role of the jury, it makes an error of evidentiary law

and abuses its discretion. *Id.*; *Moore*, 995 F.3d at 852–53. We reverse the circuit court's decisions excluding Ms. Cardell's testimony, striking the lost profits claim, and granting summary judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY REVERSED. REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**