

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

NO. PD-0192-22

## ALAN WILLIAM NULL, Appellant

**v.**

## THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE FOURTEENTH COURT OF APPEALS HARRIS COUNTY

**HERVEY, J., delivered the opinion of the court in which RICHARDSON, NEWELL, WALKER, SLAUGHTER, and MCCLURE, JJ., joined. YEARY, J., filed a concurring opinion. KELLER, P.J., and KEEL, J., concurred.**

### O P I N I O N

Appellant, William Alan Null, was convicted of second-degree felony sexual assault. A DNA analyst testified at punishment that Appellant had been linked to a previous sexual assault. The analyst reached that conclusion by comparing Appellant's profile, which she developed, to profiles an analyst at a third-party laboratory developed. Appellant objected under Rule 702 of the Texas Rules of Evidence. He argued that the analyst's testimony was unreliable because she had no personal knowledge about the

third-party laboratory or its data. The trial court overruled Appellant's objection, and the jury convicted him and sentenced him to 60 years' confinement. Appellant appealed, and the court of appeals ordered a new punishment trial. We will reverse the judgment of the court of appeals and affirm the judgment of the trial court.

## I.   BACKGROUND

### A.  Incident & Guilt Phase

In the early morning hours one Thursday in September 2011, sixteen-year-old C.A. returned home dirty, wearing someone else's clothes, and wrapped in someone else's blanket. She told her mother that she had been raped. C.A. told the sexual assault nurse examiner that a man asked her if she needed a ride when she was returning home after jogging. She said that she got into his car, and he drove to a field and asked her for oral sex. When she refused, he slapped her, pushed the seat down, and got on top of her: "He took out a switchblade and he tried to cut my clothes open. Finally[,] I could not fight it anymore. He said he was going to kill me. He had sex with me." C.A. told the nurse examiner that Appellant raped her, then kicked her out of the car, and she walked home.

At trial, C.A. testified that she skipped school the day of the incident because she did not want to see a boy. Instead, she stayed home and drank her mother's alcohol with her friend, Mita. According to C.A., after the pair drank for a while, C.A. missed her shift at a local Goodwill, and Mita drove them to her apartment. When they arrived, C.A. said that she laid down because her stomach hurt. When she woke up, C.A. left the apartment and walked home. The next thing she remembered was waking up in a stranger's car. She

said that she felt like she was being pushed down and that she was trying to push something off her. She remembered breathing hard and hearing someone else breathing. She blacked out again and woke up in the hospital.

Janie Escamilla, C.A.'s mother, testified that she returned home to find two half-empty liquor bottles on the counter and the bathroom smelling like someone had been sick. No one else was home. She said that she waited for C.A. for a while before driving to Goodwill to look for her. Escamilla said that C.A. arrived home at about 5:00 a.m. and seemed "out of it." She also said that her eyes were "glazed,"[1] her hair and makeup were messed up, she was barefoot, and she was dirty. When Escamilla began questioning her, she said that C.A. started to cry and said she had been raped.

Appellant became a suspect in 2013.[2] Police obtained a voluntary DNA sample, and Michael Donley, an analyst with the Harris County Institute of Forensic Science, developed a DNA profile and compared it to profiles developed from items in the SANE kit. His conclusions showed it was almost certain that it was Appellant's DNA on the items in the SANE kit. Donley testified about his conclusions, and the jury convicted Appellant.

---

[1] Toxicology testing showed that C.A.'s blood contained marijuana metabolites and alprazolam, commonly sold as Xanax, although she said that she had never taken it.

[2] The record does not show how Appellant became a suspect.

### B.   Punishment

#### i.   *Catherine Bunch*

Most of the punishment evidence was about an earlier victim, Catherine Bunch, and DNA comparisons linking Appellant to her sexual assault. Bunch told a detective that she was out walking one day when a man in an SUV asked her if she wanted a ride. She said that she got into his SUV and that he drove to a dumpster and offered her money for sex. According to Bunch, when she refused, he locked the doors and said: "Now you have no choice" before climbing on top of her and raping her. Bunch reported the rape and was examined by a sexual assault nurse examiner. Years later,[3] portions of the Bunch SANE kit were sent to Bode Technologies, a third-party forensic laboratory. An analyst developed DNA profiles from sperm- and epithelial-fractions, authored a report, then returned the evidence to HFSC.

#### ii.   *Mary Symonds*

Mary Symonds, who worked for the Houston Forensic Science Center (HFSC),[4] was the testifying DNA analyst. She compared Appellant's DNA profile to the profiles developed at Bode Technologies. Before she testified, Appellant objected, citing the Confrontation Clause and Rule 702 of the Texas Rules of Evidence. Appellant filed written objections, arguing Symonds' testimony would be unreliable under Rule 702

---

[3] Bunch was assaulted in October 2010. The case became inactive because police were unable to locate her. In 2017, a new detective assigned to the case was able to contact Bunch and developed Appellant as a suspect.

[4] This organization is distinct from the Harris County Institute of Forensic Science.

because she knew nothing about Bode Technologies or the technicians and analyst who worked the case. The trial court overruled Appellant's objections but let them run.

Symonds' testimony can be broken down into four parts: (1) how HFSC processes its own DNA cases, (2) HFSC's protocol when using data from third-party forensic laboratories, (3) Symonds' knowledge about Bode Technologies, and (4) conclusions she drew based on her comparisons.

### a.  *HFSC's Four-Step Process*

Symonds testified that her laboratory uses a four-step process. First, a technician attempts to extract genetic material from evidence, such as a vaginal swab or a stain on clothes. Second, the material is quantified. This involves determining whether DNA is present, and if so, isolating it. It also involves determining how much DNA was collected and its source. For example, there might be no DNA present, or it might not be from a human (e.g., another animal or bacteria). Third, certain unique repeating sequences on chromosomes called short-tandem repeats (STRs) are tagged with fluorescent markers, and billions of copies of the tagged STRs are made. Fourth, the material is processed using a capillary electrophoresis machine, which produces a graph called an electropherogram. The electropherogram shows different colors and peaks and valleys, which an analyst can possibly use to draw conclusions. For instance, an analyst might conclude that the sample is a mixture of DNA and develop a profile or profiles. On the other hand, an analyst might be unable to develop any profiles, or at least, ones suitable for comparison purposes. Analysts can also sometimes produce statistics using the Random Match Probability (RMP), Combined Probability of Inclusion/Exclusion

(CPI/CPE), or likelihood ratio (LR) methodologies. *See Ex parte Napper*, 322 S.W.3d 202, 223 (Tex. Crim. App. 2010) (RMP); *Skinner v. State*, 484 S.W.3d 434, 439 n.7 (Tex. Crim. App. 2016) (CPI/CPE); *Haggard v. State*, 612 S.W.3d 318, 323 n.8 (Tex. Crim. App. 2020) (LR).

b. *HFSC's Protocol for Third-Party Forensic Laboratories*

Symonds testified that the laboratory has a protocol when HFSC uses data generated by another laboratory to make sure that the third-party laboratory correctly performed the four-step process:

> They send me all of their documentation, all of their paperwork; and I scroll through all of those steps, make sure that all of the right spots are documented, that they've completed all the work. There would be initials; there would be dates; there would be expiration dates, lot numbers, and I check that. There are specific controls throughout all of those steps and I would go through and make sure those are there and then we're also given the raw data. So that Step 4, when it generates the graph, we're given – we're given the data that's generated from those; and we go through to determine if how they reported their report, if the way they worded it, if we agree or disagree, what alleles -- alleles are those numbers I was talking about that make you unique to who you are. I would go through and make sure that I either agree or disagree and then make corrections if needed.

She confirmed Bode Technologies' employees completed this four-step process by reviewing its casefile.

c. *Knowledge of Bode Technologies*

Symonds testified that Bode Technologies "does the same thing our lab does" and that it "was contracted by our lab to . . . help get multiple amounts of kits processed for

us."[5] Symonds also testified that the Bode Technologies report showed that it was an accredited laboratory[6] and that it used the same standards as HFSC. Symonds did not know the analyst who authored the report, her qualifications, certifications, or training. Symonds also did not know who performed the extraction, quantification, or amplification of the DNA. She did not remember which equipment Bode Technologies used to process the DNA sample, whether the equipment was calibrated, what contamination protocols the laboratory followed, or its protocols for storage or chain of custody.

### d. *Symonds' Conclusions*

Symonds' analysis of the genetic material recovered from the sperm- and epithelial- fractions decisively showed that Appellant's DNA was on Bunch's shorts.

## II. PROCEDURAL HISTORY

A grand jury indicted Appellant for second-degree felony sexual assault of a child. Following a two-day trial, a jury found him guilty and sentenced him to an enhanced 60

---

[5] Symonds was referring to the backlog of untested SANE kits stored in Harris County that were outsourced for processing.

[6] Symonds said that the accreditation process involves an outside agency physically inspecting the premises and examining the laboratory's training records and standard operating procedures. Symonds also said that the outside agency questions the employees "to make sure that we're doing what we are meant to be doing, according to the FBI standards and according to their accreditation standards."

years' sentence.[7] Appellant filed a motion for new trial, which was denied.[8] On appeal, Appellant raised eleven points of error. In three points of error—the only ones relevant here—Appellant challenged the admission of Symonds' testimony under Rule 702 as unreliable. A split-panel of the court of appeals affirmed. *Null v. State*, No. 14-19-00839-CR, 2021 WL 2324972 (Tex. App.—Houston [14th Dist.] June 8, 2021) [hereinafter *Null I*]. Sitting en banc, the court of appeals later overturned in part its earlier decision, this time granting a new punishment trial. *Null v. State*, No. 14-19-00839-CR, 2021 WL 5934770 (Tex. App.—Houston [14th Dist.] Dec. 16, 2021) (op. on reh'g) (op. withdrawn) [hereinafter *Null II*]. The court of appeals then granted the State's motion for en banc rehearing to clarify that it granted only a new punishment trial.[9] *Null v. State*, 640 S.W.3d 370 (Tex. App.—Houston [14th Dist.] 2022) (substitute op.) [hereinafter *Null III*].

The State petitioned for discretionary review on five grounds. We agreed to review the State's third and fifth grounds. Those grounds are:

- The Fourteenth Court erred when it held that a DNA profile run in [an] accredited laboratory is not something upon which an expert may rely in making a determination that DNA profiles match; and

- The Fourteenth Court erred when it held that it would violate due process for the court to take judicial notice that the science behind

---

[7] The enhancement allegation was a prior conviction for burglary of a habitation.

[8] He argued that his trial counsel was ineffective.

[9] The original judgement stated only that the court of appeals was "revers[ing] and remand[ing] for further proceedings."

DNA is valid.

### III. Reliance Under Rule 702 on DNA Data Developed At a Third-Party Forensic Laboratory

### A. Applicable Law

Expert evidence is governed by Article VII of the Texas Rules of Evidence. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

TEX. R. EVID. 702. "Scientific knowledge" must be reliable. *See Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992) (expert opinion helps the jury if it is reliable and relevant). Reliability of expert opinion about scientific knowledge is assessed in different ways depending on whether the expert opinion is about a hard or soft science. *Compare id.* (hard science), *with Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998) (soft science). This case deals with a hard science. When dealing with a hard science, we determine reliability of the testifying expert's opinions by deciding whether (1) the underlying scientific theory is valid, (2) the methodology applying the underlying scientific theory is valid, and (3) the expert properly applied the correct methodology on the occasion in question. *See Kelly*, 824 S.W.2d at 573. Expert opinion admissible under Rule 702, might still be inadmissible under Rule 403. *Id.* at 572; *see* TEX. R. EVID. 403 (otherwise admissible evidence can be nonetheless inadmissible if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or . . . presenting cumulative evidence").

Facts or data underlying expert opinion can come from three sources: (1) personal knowledge, (2) facts or data made known to the expert at trial, or (3) inadmissible facts or data so long as they are the kind on which an expert in the field would reasonably rely. *See id.* at 703. The opponent of expert opinion may take the expert on voir dire outside the presence of the jury to examine the facts or data underlying the opinion. *Id.* at 705(b). If the facts or data are not admitted, but experts in the field would reasonably rely on them, the proponent cannot disclose the facts or data until the trial court determines whether their "probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect." *Id.* at 705(d). If the facts or data are disclosed, the opponent of the evidence is entitled to a limiting instruction. *Id.*

## B. Analysis

### i. *Rule 702—Reliability of Underlying Facts or Data*

The court of appeals and Appellant believe that the State failed to prove the third reliability prong. *Null III*, 640 S.W.3d at 389. It held that the State did not show by clear and convincing evidence under Rule 702 "that the DNA testing and analysis done by Bode was properly applied on the occasion in question." *Id.* According to them, Symonds did not properly apply the methodology because she did not have personal knowledge about Bode Technologies. *Id.* at 387-88. Appellant argues, for example, Symonds had no idea if there was a chain-of-custody problem, whether Bode Technologies' employees were qualified, or whether Bode Technologies' equipment was calibrated. The State responds that Symonds' testimony is reliable because it was reasonable for her to rely on the Bode Technologies data.

But this case is not about the third reliability prong, as the court of appeals and Appellant argue, nor is it about whether Symonds reasonably relied on the Bode Technologies data, as the State argues. We are dealing with a *basis* for Symonds' opinions—the Bode Technologies data. Reasonable reliance does not apply because that is a Rule 703 issue, not a reliability issue under Rule 702. *See* TEX. R. EVID. 703.

Under Rule 702, facts or data underlying expert opinion, like expert opinions themselves, must be reliable.[10] The reliability of underlying facts or data turns on whether the data provides a sufficient basis to support the opinions. *Id.* at 702, 705(c); *see* FED. R. EVID. 702(b). Whether there is a sufficient basis is a quantitative rather than a qualitative analysis.[11] *See* FED. R. EVID. at 702 (eff. 2000, Advisory Committee Notes);

---

[10] This is in line with United States Supreme Court precedent. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) ("[T]he Rules of Evidence—especially Rule 702— [] assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."); *see also* 3 STEPHEN A SALTZBURG ET AL., FEDERAL RULES OF EVIDENCE MANUAL § 702.02[10], at 702-48 (12 ed. 2019) (recognizing that "*Daubert* implicitly required a foundation requirement for expert testimony" and that the Advisory Committee recommended amending Rule 702 to make "the foundation requirement a specific part of [Federal] Rule702"). It is also in line with Texas Supreme Court precedent. *See Merck & Co., Inc. v. Garza*, 347 S.W.3d 256, 262 (Tex. 2011) ("[C]ourts must look beyond the bare opinions of qualified experts and independently evaluate the foundational data underlying an expert's opinion in order to determine whether the expert's opinion is reliable"); *see also* FED. R. EVID. 702 (eff. 2000, Advisory Notes) ("[T]he sufficiency of the basis of an expert's testimony is to be decided under Rule 702.").

[11] *See* 3 FEDERAL RULES OF EVIDENCE MANUAL § 702.02[10], at 702-48 (12 ed. 2019) (citing *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc) (expert opinion that he would expect a defendant's hair or seminal fluid to be found on a victim if a sexual assault had occurred had an insufficient quantitative basis because the expert had no quantitative data to show "how frequently hair or seminal fluid is transferred during sexual conduct in similar cases . . .")); *see also Lancaster v. BNSF Ry. Co.*, 75 F.4th 967, 970–71 (8th Cir. 2023) (expert

29 WRIGHT ET AL., FED. PRAC. & PROC. EVID. § 6268 (2d ed. Supp. Apr. 2023) ("The question is whether the expert considered enough information to make the proffered opinion reliable."). The difference between quantitative and qualitative analyses has been explained by one federal court: [12]

> The witness' testimony that he or she obtained a measurement of . . . distance is sufficient to satisfy the "facts and data" element of Rule 702 for that component of the methodology. Whether the witness obtained the measurement with a precision laser, with a household yardstick, or by roughly pacing off the distance on foot is irrelevant to the Rule 702 analysis. Such challenges bear on the quality, not the quantity, of the data obtained by the witness and thus, bear only upon the weight that should be afforded the witness' opinion at trial.

*United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008).

Appellant does not argue that Symonds did not have enough data to perform her analyses or draw her conclusions. For instance, Appellant does not complain that there

---

opinion based on an assumption, not data, that exposure to toxins at decedent's work caused the decedent's lung cancer was inadmissible due to an insufficient quantitative basis); *MLC Intellectual Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1367 (Fed. Cir. 2021) (opinion of damages expert who based his opinion on an assumed royalty rate was inadmissible for an insufficient quantitative basis) 3 FEDERAL RULES OF EVIDENCE MANUAL § 702.02[10], at 702-48 (citing *Lennon v. Norfolk and Western Ry. Co.*, 123 F. Supp. 2d 1143, 1147 (N.D. Ind. 2000) (expert's opinion that multiple sclerosis might have been caused by a fall did not have a sufficient quantitative basis where the expert's opinion was based on only a few quantitative case studies)).

[12] *See Emerson v. State*, 880 S.W.2d 759, 768–69 (Tex. Crim. App. 1994) (the HGN test is a reliable *indicator* of intoxication (i.e., is qualitative proof), but is not reliable as to a person's *precise* BAC (i.e., is not quantitative proof), unlike a breathalyzer or a blood test).

was allelic dropout[13] or that not enough loci were examined.[14] Instead, he argues that Symonds' testimony was unreliable because she did not know about the *quality* of the Bode Technologies data. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 809 (7th Cir. 2013) ("[A]n expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility.").

Appellant cites two decisions from this Court and one from the Dallas Court of Appeals: *Kelly*, 824 S.W.2d at 571, *Braziel v. State*, No. 74,139, 2003 WL 22250398, at *3 (Tex. Crim. App. Oct. 1, 2003) (not designated for publication), and *In re S.E.W.*, 168 S.W.3d 875, 882 (Tex. App.—Dallas 2005, no pet.). In each case, the State proffered DNA evidence involving two laboratories and called sponsoring witnesses from both laboratories. Appellant argues that the State should have done that here. It is true that this Court and courts of appeals have decided cases in which the State called sponsoring witness from both laboratories, but Appellant points to no cases, nor are we aware of any,

---

[13] *See Napper*, 322 S.W.3d at 236 ("Such results could be explained by the loss of some alleles caused by a quantitative decline in the sample . . . .").

[14] *See Haggard*, 612 S.W.3d at n.9 (first kit used to test DNA evidence relied on data from only nine loci but newer kit relied on data from sixteen loci).

in which we have held that Rule 702 requires the State to call sponsoring witnesses from both laboratories.[15]

The court of appeals relies on *Dreyer v. State*, No. 09-09-00422-CR, 2011 WL 193494 (Tex. App.—Beaumont Jan. 19, 2011, no pet.) (mem. op., not designated for publication) and *Hines v. State*, 38 S.W.3d 805 (Tex. App.—Houston [14th Dist.] 2001, no pet.). Those cases relied on the experts' lack of personal knowledge about the underlying facts or data, but experts need not have first-hand knowledge of the facts or data to form an opinion. *See* TEX. R. EVID. 703. "An expert may base an opinion on facts or data in the case that the expert has been made aware of . . . [or] reviewed . . . ." *Id.*

### ii. *Rule 703—Permissible Bases of Expert Opinion Testimony*

The quality of the underlying facts or data is not just a weight issue under Rule 702. The opponent might also be able to argue that the expert opinion is inadmissible under Rule 703. Under that rule, an expert can rely on facts or data that are inadmissible "[i]f experts in the particular field would reasonably rely on those kinds of facts or data . . . ." *Id.* at 703. The argument would be that, even though Bode Technologies' casefile was not admitted (e.g., the report, the electropherogram, worksheets, etc.), experts in the field would not reasonably rely on the Bode Technologies data because of its unknown quality. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th

---

[15] We emphasize that we are discussing *only* Rule 702. Our analysis does not implicate the Confrontation Clause, which is governed by different jurisprudence, as we discuss later. *See infra*, pp. 17-18; *see e.g.*, *Melendez-Diaz*, 557 U.S. 305, 311 n.1 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647, 661 (2011); *Molina v. State*, 632 S.W.3d 539 (Tex. Crim. App. 2021); *Paredes v. State*, 462 S.W.3d 510 (Tex. Crim. App. 2015).

Cir. 2017) (facts or data are qualitatively adequate if they are the type that experts in the field would reasonably rely on); *see* TEX. R. EVID. 703. But Symonds relied on a casefile that was produced by technicians and a forensic analyst employed by a well-known and accredited third-party forensic laboratory under contract with HFSC to test items in SANE kits for DNA evidence. And Symonds testified HFSC had a standing policy for relying on third-party forensic laboratory data, showing that HFSC regularly relied on third-party laboratory data, that she had read Bode Technologies' procedures, and that she scrutinized its casefile to ensure that it followed its own internal protocols and those of HFSC.

Compare this the case cited by Appellant, *Leonard v. State*, 385 S.W.3d 570 (Tex. Crim. App. 2012) (op. on reh'g). In that case, the State wanted to disclose polygraph results to the judge. *Id.* at 581. The State's theory was that, while the "polygraph results [were] inadmissible on their own, an expert who testifies under Rule 702 may, according to Rule 703, base his opinion on inadmissible evidence and, under Rule 705,[16] inform the trial court of the basis for his opinion." *Id.*

We held that the polygraph results were an improper basis for admitting that opinion because experts in the field would not reasonably rely on the results of an examination considered inherently unreliable. *Id.* at 582; TEX. R. EVID. 703. Unlike the

---

[16] Rule 705(a) "allows a testifying expert to 'disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data.'" *Leonard*, 385 S.W.3d at 581.

inherently unreliable polygraph results in *Leonard*; however, Symonds relied on data that appears experts in the field would reasonably rely on.[17] As Justice Souter noted, it is a common practice for technicians in the field to depend on the statements of other technicians and for analysts to rely on those statements.[18] There is no reason to think that Bode Technologies technicians or its analyst deviated from its own protocols.[19]

Appellant argues that, even if the Bode Technologies data passes muster under Rule 703, it could still be unreliable under Rule 702. That is true. Professor Goode

---

[17] We do not decide the Rule 703 question because it is not before us, but we address the parties' arguments about it to highlight the differences between it and Rule 702.

[18] *See Williams v. Illinois*, 567 U.S. 50, 89 (2012) (plurality op.) (Souter, J., concurring) ("Experts—especially laboratory experts—regularly rely on the technical statements and results of other experts to form their own opinions. The reality of the matter is that the introduction of a laboratory report involves layer upon layer of technical statements (express or implied) made by one expert and relied upon by another.").
    We find the physician example given by the 1972 Advisory Comments to the Federal Rules of Evidence informative. *See* FED. R. EVID. 703 (1972 Advisory Comments). DNA analysts' conclusions are drawn from a variety of sources, like physicians, but unlike relying on statements by patients and relatives, and reports from other nurses and other physicians, etc., DNA analysts rely on the people who collect the evidence, transmit the evidence, screen the evidence, extract the genetic material, quantify the genetic material, amplify the genetic material, and anyone else who plays a part in processing and testing the evidence. *See id.* And like sources of information for a physician, most sources of information for DNA analysts "are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses." *Id.* An expert's "validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." *Id.*

[19] In *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338 (Tex. 2015), the Supreme Court of Texas stated,

> [In a reliability analysis,] an expert is allowed to consult such material in coming to their opinions. No rule prohibits experts from using other experts' opinions to formulate new opinions based on their own expertise. In fact, Texas Rule of Evidence 703 and our prior cases contemplate exactly such an arrangement.

*Id.* at 352 (citing TEX. R. EVID. 703).

explains: "An expert may rely on the kind of facts or data that other experts in her field reasonably rely on, yet draw a completely unreliable conclusion. The expert might, for example, ignore other pertinent data or simply make unjustified analytical leaps from the data." 2 GOODE ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 703.3, at 112, 117-18 (4th ed. 2016); *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). But that is not what happened here.

### iii.     *Rule 705(d)—Balancing Rule and Limiting Instruction*

We also note that, even if an expert opinion passes muster under Rule 702 and Rule 703, the underlying facts or data may not be disclosed to the jury unless "their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect." TEX. R. EVID. 705(d). If the facts or data can be disclosed, the opponent of the evidence is entitled upon request to a limiting instruction. *Id.*

### iv.     *Confrontation Clause*

The court of appeals' majority and dissent rely on Confrontation Clause cases in their analysis. The majority concludes that Symonds was merely a surrogate for the Bode Technologies data. It cites *Paredes v. State*, 462 S.W.3d 510 (Tex. Crim. App. 2015). We held in *Paredes* that,

> For an expert's testimony based upon forensic analysis performed solely by a non-testifying analyst to be admissible, the testifying expert must testify about his or her own opinions and conclusions. While the testifying expert can rely upon information from a non-testifying analyst, the testifying expert cannot act as a surrogate to introduce that information.

*Id.* at 517-18 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009)). In reaching our holding, we also relied on the low risk of human-factor error and that "the Confrontation Clause does not mandate 'that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device' must testify." *Id.* at 518 (quoting *Melendez-Diaz*, 557 U.S. at 311 n.1). The dissent cites *Molina*, which is more on point than *Paredes* in that it involved analysts at different laboratories instead of analysts from the same laboratory. *See Null III*, 640 S.W.3d at 394 (Christopher, J., dissenting) (citing *Molina v. State*, 632 S.W.3d 539 (Tex. Crim. App. 2021)).

Both cases deal with the testimonial nature of evidence.[20] But this case is about the rules of evidence. That said, we point out that Symonds performed her own analyses and testified to her own conclusions. Also, just like the testifying analysts in *Paredes* and

---

[20] *See* 1 McCORMICK ON EVID., RELIABILITY: THE CASE-SPECIFIC FACTS ANALYZED; PERSONAL KNOWLEDGE; HYPOTHETICAL QUESTIONS; SECONDHAND REPORTS § 14 (8th ed. 2020) (discussing the various approaches state and federal courts have taken to interpreting Rule 703and how *Williams* might impact the future of the rule); *Smith v. Arizona*, No. 22-899 (2023). The question presented in *Smith* is:

> Whether the Confrontation Clause of the Sixth Amendment permits the prosecution in a criminal trial to present testimony by a substitute expert conveying the testimonial statements of a nontestifying forensic analyst, on the grounds that (a) the testifying expert offers some independent opinion and the analyst's statements are offered not for their truth but to explain the expert's opinion, and (b) the defendant did not independently seek to subpoena the analyst.

Brief for Petitioner at (i) (No. 22-899), *Smith v. Arizona*, 2023 WL 2571950 (2023), *available at* https://www.supremecourt.gov/DocketPDF/22/22-899/259227/20230316140125584_Smith%20Petition%20for%20Writ%20of%20Certiorari.pdf. Oral arguments took place in January 2024.

*Molina*, Symonds relied on the computer-generated data (the electropherogram), and the underlying report was not admitted. The only issue here is whether the Bode Technologies data was reliable under Rule 702, which requires that the quantity of data collected by Bode Technologies support Symonds' opinions. It does, and Appellant does not argue otherwise. His only complaint is about the quality of the data.

> v. *The Relationship Between Rule 702 Reliability of Underlying Facts or Data & Rule 705(c)*

Finally, we address overlap between our interpretation of Rule 702 requiring that the facts or data underlying expert opinion be reliable and Rule 705(c)'s sufficient-basis reliability requirement. TEX. R. EVID. 705(c).

Rule 705(c) predates *Kelly* and *Daubert* and the requirement that expert evidence be reliable under Rule 702. Professor Steven Goode, who conceived of Rule 705(c) in 1984,[21] now believes that it is "vestigial" and "simply replicates one of the reliability

---

[21] Professor Goode was a reporter for the Subcommittee on Criminal Matters under the Select Committee of the Judiciary, which was one body tasked with drafting rules of evidence in Texas. He explained his intent behind Rule 705(c):

> C and D go to the problem of. . . (inaudible) whether or not the witness, the expert has sufficient basis for the opinion. If it turns out that the expert is testifying to an opinion without sufficient basis for that opinion C makes clear to the court to exclude the opinion at least until the proponent of the testimony presents sufficient underlying facts or data. l think that would be just a. . . (inaudible) of what is now the rule in Texas.

Transcript of May 18, 1984, Standing Committee on the Administration of Rules of Evidence in Civil Cases, at 173, *available at* https://lrl.texas.gov/scanned/legisCmteMinutes/JointCmtes/68-0/Judiciary_Select/Criminal_Subcommittee_General_Counsel_Files.pdf.

requirements demanded of expert testimony under the *Daubert*/*Robinson*/*Kelly* line of cases." 2 STEVEN GOODE ET AL., TEXAS PRACTICE SERIES: GUIDE TO THE TEXAS RULES OF EVIDENCE § 705.1, at 134, 134 (4th ed. 2016). We seem to have suggested that Rule 705(c) is part of the Rule 702 reliability analysis, although we have never analyzed the issue in any depth. *See, e.g.*, *Vela v. State*, 209 S.W.3d 128, 133 (Tex. Crim. App. 2006) (mentioning Rule 705(c) then relying on Rule 702 reliability jurisprudence); *Bekendem v. State*, 441 S.W.3d 295, 303 (Tex. Crim. App. 2014) (mentioning Rule 705(c) then relying on Rule 702 reliability jurisprudence); *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020) (mentioning Rule 705(c) then relying on Rule 702 reliability jurisprudence); *Wolfe v. State*, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017) (mentioning Rule 705(c) then relying on Rule 702 reliability jurisprudence). But Rule 705(c) is still on the books.[22] Consequently, opponents of expert opinion can object under both rules. But the analysis will be the same.

---

[22] In 2000, after the United States Supreme Court decided *Daubert* and its progeny, it amended Rule 702 to conform to its precedent. FED. R. EVID. 702 (eff. Dec. 1, 2000); *see* Order Amending the Federal Rules of Evidence, 529 U.S. 1189, 1191, 1195 (Apr. 17, 2000), *available at* https://www.supremecourt.gov/opinions/boundvolumes/529bv.pdf, at 1189, 1195. The amended rule required that "the testimony is based upon sufficient facts or data." FED. R. EVID. 702(1) (eff. Dec. 1, 2000). In 2023, Rule 702 was amended again, but the sufficient-basis requirement was not affected. *Id.* 702(b) (eff. Dec. 1, 2023); *see* Order Amending the Federal Rules of Evidence (Apr. 24, 2023), *available at* https://www.supremecourt.gov/orders/courtorders/frev23_5468.pdf. Many states have followed the lead of the United States Supreme Court. Texas has not.

### IV.  THE JUDICIAL NOTICE GROUND FOR REVIEW

The court of appeals held that it would violate due process to hold that the trial court took judicial notice of the widespread acceptance of DNA science. *See Null III*, 640 S.W.3d at 394. It reached this issue in response to an argument from the dissent. *See id.* The dissent argued that Appellant did not preserve complaints that the scientific theories and methodologies Symonds relied on are invalid, and that, even if he had, the court of appeals could have taken judicial notice of the widespread acceptance of DNA science.[23] *See id.* at 393 (Christopher, J., dissenting). As we explain below, we agree with the dissent's preservation-of-error argument.[24] We also conclude that the court of appeals should not have decided the judicial notice issue and that its resolution of the issue is dicta.

### A.  Applicable Law

Preservation of error is governed by Rule 33.1 of the Texas Rules of Appellate Procedure. TEX. R. APP. P. 33.1. Under this rule, a party cannot present a complaint for appellate review unless the record shows that the party made a timely objection or motion stating the grounds for the requested ruling, unless the ground were apparent from the context. *Id.* 33.1(a)(1)(A). The party must also obtain a ruling from the trial court or

---

[23] There was some confusion in the court of appeals about which court might be able to take judicial notice. The majority referred to the trial court, but the dissent referred to the court of appeals. *Compare Null III*, 640 S.W.3d at 389, *with id.* at 391 (Christopher, J., dissenting).

[24] We refused review of the State's preservation-of-error argument, but now we grant it on our own motion because it resolves the judicial notice ground for review. TEX. R. APP. P. 66.1.

object to the trial court's refusal to rule on the objection or motion. *Id.* at 33.1(a)(2). "The purpose for requiring a timely, specific objection is twofold: (1) it informs the judge of the basis of the objection and affords him an opportunity to rule on it[;] and (2) it affords opposing counsel an opportunity to respond to the complaint." *Williams v. State*, 662 S.W.3d 452, 460 (Tex. Crim. App. 2021) (quoting *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015)). Preservation of error is a systemic requirement, and "on direct appeal it has been the common practice of this Court and of the intermediate appellate courts in Texas to examine matters affecting the preservation of error, whether separately argued by the parties or not." *Hughes v. State*, 878 S.W.2d 142, 151 (Tex. Crim. App. 1992) (op. on reh'g); *Fuller v. State*, 829 S.W.2d 191, 199 n.4 (Tex. Crim. App. 1992).

## B.  Analysis

This Court has never addressed this exact question, although a few courts of appeals have.[25] These courts have held that a general objection to the reliability of expert

---

[25] *See, e.g.*, *Allen v. State*, No. 07-22-00146-CR, 2023 WL 4348104, at *2 (Tex. App.—Amarillo June 30, 2023, pet. ref'd) (mem. op., not designated for publication) ("[T]o preserve a complaint that scientific evidence is unreliable, a party must make a specific objection to the particular deficiency regarding reliability to allow the offering party an opportunity to cure any defect.); *Pinkston v. State*, Nos. 02-22-00076-CR & 02-22-00077-CR, 2023 WL 3017661, at *7-8 (Tex. App.—Fort Worth Apr. 20, 2023, pet. ref'd) (mem. op., not designated for publication) (citing *Scherl v. State*, 7 S.W.3d 650, 652 (Tex. App.—Texarkana 1999, pet. ref'd)) (the appellant forfeited error for appellate review that an expert's testimony was unreliable because he did not explain why he believed it was unreliable); *see also Crider v. State*, No. 11-16-00302-CR, 2018 WL 1547217, at *7 (Tex. App.—Eastland Mar. 30, 2018, no pet.) ("Objections based simply on Rule 702, without more specificity, 'are, in effect, general objections to an improper predicate' and '[a]n objection to an improper predicate that fails to inform the trial court exactly how the predicate is deficient will not preserve error.'") (punctuation in original); *Gregory v. State*, 56 S.W.3d 164, 182 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd) (same) (citing *Bird v. State*, 692 S.W.2d 65, 70 (Tex. Crim. App. 1985)).

evidence does not preserve error. We agree. As the State argues, Rule 702 can be broken into several parts, each of which requires a different inquiry—qualification, reliability, and relevancy—and the United States Supreme Court and this Court have identified many non-exclusive factors to consider when deciding whether proffered expert evidence is reliable. Further, expert testimony might rely on multiple scientific theories and methodologies. That is the case here with Symonds.

Were we to hold that a general objection is sufficient, the proponent of expert opinion could be saddled with an incredible burden. Take this case for example. On a bare objection by Appellant, should the State have had to prove the validity of all the scientific theories and methodologies Symonds relied on? What about whether the facts or data underlying her opinions are reliable? We think placing the burden on the opponent to identify which aspect of reliability he is challenging is an appropriate and modest one.[26]

Appellant seemed to refer to the second and third reliability prongs in his written objections when he argued that Symonds did not know the underlying methodology Bode used or whether the method was properly applied here:

> [Symonds'] opinion and testimony violate Texas Rule of Evidence 702 as
> the witness has no knowledge as to how Bode conducted their DNA testing,

---

[26] *See, e.g.*, *Acevedo v. State*, 255 S.W.3d 162, 167 (Tex. App.—San Antonio 2008, pet. ref'd) ("A specific objection regarding expert testimony must detail the particular deficiency in the expert's qualifications or the reliability of the expert's opinions."); *Chisum v. State*, 988 S.W.2d 244, 247, 250-51 (Tex. App.—Texarkana 1998, pet. ref'd) (objection without specifying a particular deficiency in a proffered expert's qualifications or the reliability of the evidence preserved nothing for review because it was a general objection).

or whether the person who did the testing was qualified to do it or whether he or she did it correctly. This means the reliability prong of Texas Rule of Evidence 702 cannot be met with regard to Ms. Symonds['] expert opinions.

Before Symonds testified at the hearing, Appellant reiterated his written objections.[27] Appellant never argued at trial that the State failed to prove the validity of the scientific theories or methods underlying the DNA testing in this case. Appellant made those arguments for the first time in his direct appeal brief. Therefore, Appellant forfeited those arguments for appellate review. TEX. R. APP. P. 33.1(a)(1)(A).

## V. CONCLUSION

The trial court did not abuse its discretion when it admitted Symonds' expert testimony under Rule 702, and the court of appeals erred when it decided the judicial notice issue because it was moot given that Appellant forfeited the arguments the issue was based on. We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

Delivered: June 12, 2024

Publish

---

[27] Appellant also objected under the Confrontation Clause, but he forfeited that argument on appeal.